UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| Pacers Basketball, LLC, | ) | |
| | ) | |
| Petitioner/Movant, | ) | |
| | ) | |
| v. | ) | CAUSE NO:  1:21-MC-4 |
| | ) | |
| adidas America, Inc. | ) | Related case: *Brian Bowen, II v. adidas* |
| | ) | *America, Inc., et al.*, Case No. 3:18-cv-3118 |
| Respondent. | ) | JFA |

**PACERS BASKETBALL, LLC'S MOTION TO QUASH
<u>SUBPOENA TO PRODUCE DOCUMENTS</u>**

NOW COMES Petitioner Pacers Basketball, LLC ("PBLLC"), by counsel, and pursuant to Rule 45(d)(3) of the Federal Rules of Civil Procedure ("Rule"), respectfully moves this Court to Quash the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("Subpoena"), in part, served by adidas America, Inc. ("Adidas") in the action pending in the United States District Court for the District of South Carolina, as Case No. 18-cv-3118-JFA ("Litigation"), and respectfully states as follows:

I.      **Introduction**

PBLLC owns and operates the Indiana Pacers ("Pacers"), a professional basketball team located in Indianapolis, Indiana, and one of thirty (30) member teams part of the National Basketball Association ("NBA"). Upon information and belief, one of the Pacers' players, Brian Bowen, II ("Bowen Jr."), is a plaintiff in the Litigation, in which Adidas is one of the named defendants. On or about November 20, 2020, Adidas issued the Subpoena to PBLLC. A true and correct copy of the Subpoena is attached as "<u>Exhibit A</u>." The Subpoena, in part, requests highly guarded confidential and proprietary information maintained by PBLLC, such as "written

evaluations or assessments" of Bowen Jr., "documents concerning the Pacers' decision to sign Bowen Jr.," and documents discussing his medical condition. *See* Ex. A.

PBLLC brings this Motion to Quash the Subpoena because it is overly broad and improperly seeks confidential, protected, and proprietary information held by PBLLC. Permitting Adidas to discover the requested documents in the Subpoena would result in improper disclosure of Bowen Jr.'s personal and protected information, as well as cause irreversible economic harm to PBLLC. Further, the Confidentiality Order[1] currently entered between the parties of the Litigation is insufficient to curb these concerns for nonparty PBLLC.

Pursuant to Local Rule 37.1 of the Southern District of Indiana, PBLLC and Adidas, by counsel, made a good faith effort to resolve PBLLC's disputes with the Subpoena on January 5, 2021. Although the parties have tentatively resolved the issues of Request Nos. 7 and 8 of the Subpoena,[2] PBLLC and Adidas were unable to agree on the remaining requests in the Subpoena; therefore, PBLLC is moving to quash the remaining requests of the Subpoena.

## II.      Statement of Jurisdiction and Venue

Rule 45 permits a party to command a person, including a nonparty, to produce documents within 100 miles of where that person resides. FRCP 45(c)(2). Where "the person resides" is deemed the "place of compliance" for purposes of Rule 45. If a party wishes to quash or modify a subpoena, then the party must timely file a motion in "the court for the district where compliance is required." FRCP 45(d)(3). In the event that the court where compliance is required is not the

---

[1] The Confidentiality Order is attached to the Subpoena.

[2] PBLLC and Adidas have preliminarily resolved Request Nos. 7 and 8 of the Subpoena. Request No. 7 seeks Bowen Jr.'s "employment record or file," and Request No. 8 seeks documents "relating to Bowen Jr.'s medical condition." *See* Ex. A. PBLLC has agreed to respond to Request No. 7, except for Bowen Jr.'s player contract, within the scope agreed to by the parties. PBLLC has also agreed to respond to Request No. 8, provided proper authorization is received from Bowen Jr. As of the date of this Motion, the authorization has not been obtained.

same as the court that issued the subpoena, Rule 45 permits the court to transfer a motion to quash to the issuing court. FRCP 45(f).

The Subpoena issued to the Pacers commands that it produce documents at 125 S. Pennsylvania Street, Suite 600, Indianapolis, Indiana. Thus, the "place of compliance" for purposes of Rule 45 is in Indianapolis, Indiana, where this court is located. *See Westmore Equities, LLC v. Vill. of Coulterville*, No. 3:15-CV-241-MJR-DGW, 2016 WL 695896 at *2 (S.D. Ill. Feb. 22, 2016). Since the Subpoena's place of compliance is in Indianapolis, this court is the appropriate venue.

### III.      Background

The Pacers are one (1) of thirty (30) total teams in the NBA. The NBA is a highly competitive professional sports league, and one of the most successful and valuable professional sports associations in the world, and each member team of the NBA is an incredibly valuable asset. For illustration, the average NBA team is valued at more than $2 billion, and the average team values continue to increase at a rate higher than rivals in Major League Baseball ("MLB") and the National Football League ("NFL").[3] Needless to say, NBA teams place significant value on their operations and go to great lengths to protect confidential and proprietary information in order to maintain and grow their value.

NBA teams such as the Pacers continue to invest significant sums of money in analytics, scouting, and personnel in order to gain a competitive advantage over other NBA teams. In order to maintain and capitalize on the strategic competitive advantages sought as part of this investment, it is of utmost importance to the Pacers to maintain the proprietary nature of the information

---

[3] The Business of Basketball: Forbes Releases 22nd Annual NBA Team Valuations, FORBES (Feb. 11, 2020). *Available at* https://www.forbes.com/sites/forbespr/2020/02/11/the-business-of-basketball-forbes-releases-22nd-annual-nba-team-valuations/?sh=1497f47f75ff.

gathered, how that information is used, and the methods used to apply the information to the business. The need to protect such information is obvious given the amount of resources allocated by an organization, but it is also imperative given the competitive nature of professional sports and the tremendous negative impact if such information was disclosed to an opponent or adverse party. For instance, the New England Patriots, an NFL team, was "admonished" in 2007 for recording other teams' practices, and also stealing playbooks and scouting reports.[4] More recently, the St. Louis Cardinals ("Cardinals"), a MLB team, was investigated in 2015 by the Federal Bureau of Investigation for illegally accessing the Houston Astros', another MLB team, internal computer network.[5] Ultimately, the investigation resulted in the Cardinals' scouting director entering into a plea agreement where he pled guilty to twelve (12) counts of corporate espionage, which included accessing the Houston Astros' scouting reports on players. These incidents underscore the value that professional sports teams place on proprietary information, and the corresponding need to protect such information.

More specifically, "[t]he NBA is, by most accounts, the second most advanced league when it comes to statistical analysis, with professional basketball teams increasingly developing their own proprietary methods to look for any possible competitive advantage…"[6] At a fundamental level, a NBA team's success and level of competitiveness are contingent on the players that it scouts and ultimately signs to its roster, as well as those that it does not. To that end, NBA teams devote substantial resources to scouting, player evaluations, and data analytics to

---

[4] Don Van Natta Jr. and Seth Wickersham, "From Spygate to Deflategate: Inside What Split the NFL and Patriots Apart," ESPN (Sep. 7, 2015). *Available at* https://www.espn.com/espn/otl/story/_/id/13533995/split-nfl-new-england-patriots-apart.

[5] Lara Grow & Nathaniel Grow, "Protecting Big Data in the Big Leagues: Trade Secrets in Professional Sports," 74 Wash. & Lee L. Rev. 1567, 1569 (2017).

[6] *Id.* at 1576.

determine the appropriate players to sign for their team and often use very different measures and metrics and place a different level of emphasis on certain skill sets and player characteristics based on their unique roster needs, financial constraints, market size, and short and long term goals.

The economic implications of these "hiring decisions" are far-reaching. For instance, they can impact a team's competitiveness for long periods of time, which in turn will impact many areas of the franchise, such as, ticket sales revenue, merchandise revenue, broadcast revenue, sponsorship revenue, and even other players' decisions to join or leave the team. Put simply, the proprietary information maintained by NBA teams is not just a compilation of information. Rather, this proprietary information is their "recipe for success" that is crucial to their strategic decision-making to be competitive with other NBA teams.

## IV.     Standard of Review and Applicable Law

Rule 45(d)(3) provides that "[o]n timely motion, the court for the district where compliance is required *must* quash or modify a subpoena that requires disclosure of privileged or other protected matter." FRCP 45(d)(3)(A) (emphasis added).  A court must also quash a subpoena that subjects a person to undue burden. *Id.* Alternatively, Rule 45(d)(3)(B) is discretionary in that a court may quash or modify a subpoena if it requires "disclosing a trade secret or other confidential research, development, or commercial information." FRCP 45(d)(3)(B).

## V.     Argument

The Subpoena, in part, **must** be quashed under subsections (A) and (B) of Rule 45(d)(3). The Subpoena – specifically Request No. 8 – requests Bowen Jr.'s entire medical file, which is protected and privileged information under federal and state law, thus, the court "must" quash this portion of the Subpoena by the plain language of Rule 45. *See* FRCP 45(d)(3)(A). The Subpoena also seeks proprietary information developed by PBLLC that constitutes trade secrets and

confidential commercial information, and it is in the court's discretion to quash or modify the Subpoena pursuant to Rule 45(d)(3)(B). Given the investment and economic value of PBLLC's proprietary information, the court should quash certain requests of the Subpoena. Finally, the Confidentiality Order or any protective order would be insufficient to adequately protect PBLLC from economic harm if its proprietary information was disclosed. Further, there is no way to modify the Subpoena to alleviate the economic harm to PBLLC if it is compelled to produce any of the documents requested in Request Nos. 1-3, 5, 6, and 9-11 of the Subpoena. Thus, the only just result is to quash the Subpoena with respect to the above-referenced requests.

### a. Compliance with the Subpoena Requires Disclosure of Privileged Information

The Subpoena requests privileged and protected matter from PBLLC, thus, the court **must** quash it. Under Rule 45(d)(3)(A)(iii), a court **must** quash a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." FRCP 45(d)(3)(A)(iii) (emphasis added). Request No. 4 of the Subpoena seeks disclosure of protected matter by its request for a copy of the "two-way player contract between the Pacers and Bowen Jr." *See* Ex. A. Request No. 8 of the Subpoena also requires PBLLC to produce protected matter by its request for all documents and communications relating to Bowen Jr.'s "medical condition…including but not limited to, the results of any physical examinations, magnetic resonance imaging ("MRI") exams, X-rays, laboratory reports, or other medical tests." *See* Ex. A.

A person's medical and health information is strongly protected under federal and state law. The Americans with Disabilities Act ("ADA"), 42 USC § 12101, *et seq.*, prohibits an employer from disclosing their employee's medical record, unless it is for specific purposes, such as informing supervisors regarding necessary restrictions on the work or duties of the employees. *See* 42 USC § 12112(d). Other exceptions are provided in the ADA, but none are applicable in this

situation. *See* 29 CFR § 1615(e). Indeed, in *Bennett v. U.S. Postal Serv.*, the Equal Employment Opportunity Commission confirmed that disclosure of an employee's medical records in response to a state court subpoena is prohibited under the ADA, unless the employee authorizes such disclosure. *Bennett v. U.S. Postal Serv.*, 2011 WL 244217 (E.E.O.C.), Jan. 11, 2011.

Request No. 8 of the Subpoena expressly requests PBLLC to produce Bowen Jr.'s medical records, however, as discussed above, such information is "protected matter" under federal law. Bowen Jr. has not consented to or otherwise authorized PBLLC to disclose his medical information to Adidas, and therefore, "no exception or waiver applies" that would permit PBLLC to respond to this request in the Subpoena without running afoul of the ADA. However, as part of the "meet and confer" under Local Rule 37.1 of the Southern District of Indiana, PBLLC agreed to provide the requested medical information only upon receipt of written authorization from Bowen Jr. to release his medical information. Adidas agreed. However, as of the filing date of this Motion to Quash, PBLLC has yet to receive the authorization from Bowen Jr. to release his medical information.

Request No. 4 seeks disclosure of Bowen Jr.'s "two-way player contract" with the Pacers. PBLLC has internal policies which proscribe PBLLC or any of its employees from disclosing any confidential player information, which includes a player's contract and the terms therein. *See* the Affidavit of Chad Buchanan, General Manager of the Pacers, attached hereto as "Exhibit B". Furthermore, Adidas can request this information from Bowen Jr. as the plaintiff in the Litigation. Therefore, as Request Nos. 4 and 8 of the Subpoena request PBLLC to provide information that is protected, the Subpoena with respect to these specific requests **must** be quashed pursuant to Rule 45(d)(3)(A)(iii).

### b. Compliance with the Subpoena Requires Disclosure of Proprietary Information

The Subpoena – specifically, Request Nos. 1-3, 5, 6, and 9-11 – should be quashed as it requires PBLLC to disclose trade secrets and proprietary information. A court may, on motion, quash or modify a subpoena if it requires "disclosing a trade secret or other confidential research, development, or commercial information." FRCP 45(d)(3)(B)(i). Because trade secrets are governed by state law, it is necessary to note that the "law of the forum" dictates the applicable state law. *See Exec. Mgmt. Servs., Inc. v. Fifth Third Bank*, 309 F.R.D. 455, 459 (S.D. Ind. 2015) (quoting *Palmer v. Fisher*, 228 F.2d 603, 608 (7th Cir. 1955)). Furthermore, although no case law expressly states that "trade secrets" under Rule 45 are defined by the nonparty's state of residence, when a court hearing a discovery dispute is located in a different state than the action is pending, the court hearing the dispute must apply the forum's choice of law rules. *Feist v. RCN Corp.*, No. 12-CV-80119 SI (NC), 2012 WL 12895679, at *8 (N.D. Cal. Aug. 13, 2012). In Indiana, a choice of law analysis is only necessary if there is a conflict between the two states. *Stonington Ins. Co. v. Williams*, 922 N.E.2d 660, 665 (Ind. Ct. App. 2010). Here, both South Carolina – where the Litigation is pending – and Indiana, have adopted the Uniform Trade Secrets Act. Accordingly, Indiana law is applicable.

Under Indiana law, a trade secret is characterized as 1) information, including a program, method, or technique, that 2) derives economic values, whether it be actual or potential, 3) is not generally known or readily ascertainable, and 4) is the subject of reasonable efforts to maintain its secrecy. *See* I.C. 24-2-3-2; *see also Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 813 (Ind. Ct. App. 2000). Threshold factors for a court to consider "are the extent to which the information is known by others and the ease by which the information could be duplicated by legitimate means." *PrimeCare Home Health v. Angels of Mercy Home Health Care, L.L.C.*, 824

N.E.2d 376, 381 (Ind. Ct. App. 2005). If the alleged trade secret cannot be duplicated or acquired without a substantial investment of time, then the "not readily ascertainable" requirement may be satisfied. *Id.*

The Subpoena, in part, seeks internal notes and communications on the decision to retain Bowen Jr. as an employee and player for the Pacers, including written evaluations and assessments of his skills/abilities, development potential, and the impact Bowen Jr. would have playing with the Pacers. *See* <u>Ex. A</u>. These requests undoubtedly seek numerous protected trade secrets. First, PBLLC's written evaluations and assessments of Bowen Jr.'s skills necessarily include PBLLC employees' individual opinions of Bowen Jr.'s skills and attributes. *See* <u>Ex. B</u>. Second, the scouting efforts by PBLLC to compile information and opinions on current and prospective players are comprehensive processes and methodologies which are used to evaluate players nationally and internationally. <u>Ex. B</u> at ¶ 4. Third, PBLLC's player evaluations include rankings of specific skillsets, based on the professional opinions of PBLLC's scouts. *Id.* at ¶ 5. The specific criteria, such as the categories and rankings included in the written evaluations and the weight and importance given to the various data, is based on PBLLC's strategic decisions and value placed on particular attributes that it believes will give the Pacers a competitive advantage over other NBA teams. *Id.* For its data analytics, PBLLC utilizes algorithms PBLLC created specifically for its own needs that place weight on certain factors that align with its overall competitive strategy. In other words, PBLLC's player evaluations, assessments, and analytics are unique to the Pacers, as they contain categories customized to PBLLC's preferences, competitive strategy, and include the professional opinions of its scouts. *Id.* These elements together make the Pacers easily distinguishable from and competitive with other NBA teams. *See Id.* at ¶ 11.

Clearly, PBLLC's written evaluations and assessments of Bowen Jr. and other players are protected methods and techniques developed to gain a competitive and economic advantage. *See* I.C. 24-2-3-2. Although there is minimal caselaw directly applicable to professional sports and scouting evaluations, one case provides guidance. In *Nat'l Football Scouting, Inc. v. Rang*, the plaintiff, National Football Scouting, provided scouting reports of prospective players to twenty-one (21) different NFL teams. *Nat'l Football Scouting, Inc. v. Rang*, 912 F. Supp. 2d 985 (W.D. Wash. 2012). The plaintiff organized its reports, which included injuries, a player's background, college statistics, and an overall "player grade." *Id.* at 988-989. The defendant was a sportswriter who published articles discussing the player grades assigned by the plaintiff for certain players. *Id.* at 989. The plaintiff filed a lawsuit for copyright infringement and misappropriation of trade secrets. When discussing whether the player reports qualified as trade secrets or not, the court observed that "information" was protected as a trade secret under the plain language of the Uniform Trade Secrets Act. *Id.* at 996. Ultimately however, *Rang* turned on a factual dispute over the economic value of the player grades, and the efforts aimed at preserving their secrecy. *Id.*

Here, there is no dispute of the substantial economic value of PBLLC's written evaluations and assessments. This information is considerably more complex and valuable than the "player grades" at issue in the *Rang* case. PBLLC's evaluations and assessments include personal opinions evolving from tens to hundreds of hours observing players on and off the court, interviews, PBLLC's customized rankings, and psychological evaluations, all of which weigh heavily more in favor of protecting the information as trade secrets. *See* Ex. B at ¶ 5.

Further, there is no dispute of the extreme measures PBLLC has taken to preserve the secrecy of this information. The plaintiff in *Rang* disclosed its player evaluations publicly, while PBLLC **does not** disclose these evaluations outside of its organization, and even limits access to

such evaluations to select personnel inside the organization. *See Rang*, 912 F. Supp. 2d at 988. As discussed herein, the economic advantage of the information is evident, and PBLLC has extensive security measures to protect the secrecy of its evaluations and assessments.

In *Rang*, the court held that information, such as scouting reports, would qualify as protected "information" under Washington's Uniform Trade Secrets Act, which is modeled after the Uniform Trade Secrets Act. Thus, using *Rang* guidance, it is clear that PBLLC's written evaluations and scouting reports demand that the court treat them as trade secrets as well.

The second factor of the trade secret analysis – the economic advantage of PBLLC's player evaluations and assessments – cannot be understated. As a team in the NBA, the Pacers' success, both economically and competitively, is determined by the players it chooses to sign to its roster, and those that it does not. Ex. B at ¶ 4. PBLLC's revenue and overall business success is directly related to the performance of the team. To form a competitive team, it is necessary to not only identify the best available players, but also identify ones that have current value, potential value, and ones that will sync with the current players, all within PBLLC's own financial constraints. *Id*. at ¶ 12. The more competitive the Pacers are in the NBA, the more economic benefits it receives, such as ticket revenues, broadcasting revenues, sponsorship revenues, and merchandise sales. *Id*. at ¶ 5. If the Pacers are competitive enough to qualify for the NBA playoffs, then all of the categories of revenue increase even more. The player evaluations and assessments also provide economic advantage in that they are utilized extensively by PBLLC in contract negotiations with current and prospective players and their agents. *Id.* at ¶ 12. With extensive knowledge about a player's skillsets, tendencies, strengths and weaknesses, PBLLC is able to make informed decisions regarding player compensation and avoid overpaying for players, and/or entering into a salary cap hampering contract for a particular player. *Id.* at ¶ 10-12.

The third factor for protection as a trade secret – it is not generally known or readily ascertainable – is easily satisfied as well. The evaluations and assessments are cultivated and maintained internally and with various third-party vendors, such as RealGM and Synergy, with whom PBLLC have relationships. Ex. B at ¶ 5-6. PBLLC has invested substantial time and money in customizing its databases unique to the Pacers, and fine-tuning the categories, attributes, and overall layout of its player evaluations and assessments in its databases both internally and with the third-party vendors. *Id.* at ¶ 4-5. Thus, the data held, generated, and maintained internally and by third-party vendors is not publicly available information, as it is specific datasets that PBLLC elects to track and create. While vendors like RealGM and Synergy have relationships with other NBA teams, PBLLC works with these vendors to create customized software solutions and reports that align with PBLLC's unique strategic needs, which are not available to other NBA teams and certainly not available to the public. *Id.* The customized services and the deliverables PBLLC requests are protected by confidentiality obligations in PBLLC's vendor agreements. Further, PBLLC's relationship with such third-party vendors has been lengthy (e.g., PBLLC and REALGM have worked together since at least 2005), thus, these vendors house troves of PBLLC's assessments, evaluations, and other confidential and proprietary information. As more information is inputted into these systems by PBLLC's scouts and personnel, PBLLC is able to analyze current information versus historical data specific to PBLLC's competitive strategies and philosophies. Because these vendors hold volumes of information that is selectively input by PBLLC personnel over time, and the data and analyses provided by the vendors are based on the historical information, the information cannot be generally known or readily ascertainable to other NBA teams or the public. *See Id.* at ¶ 5-6. This all contributes to PBLLC's evaluation and assessment of a player.

Moreover, in determining whether information is "readily ascertainable," the Supreme Court of Indiana considers the "degree of time, effort, and expense required" of a party to acquire or reproduce the trade secret information. *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 918 (Ind. 1993). Also, in cases "where the duplication…of alleged trade secret information requires a substantial investment of time, expense, or effort," then that information may not be "readily ascertainable." *Id.*   In fact, in some circumstances, even the compiling of information itself is entitled to protection. <u>*N. Elec. Co. v. Torma*</u>, 819 N.E.2d 417, 426 (Ind. Ct. App. 2004). Not only has PBLLC invested substantial amounts of time and energy to construct teams that win, PBLLC spends several million dollars on data analytics, scouting, and evaluations, annually, which includes the costs of using its third-party vendors. <u>Ex. B</u> at ¶ 4. PBLLC invests considerable time, expense, and effort in acquiring, analyzing, and compiling such information, which weighs in favor of protecting the information as a trade secret. Additionally, because PBLLC's information is a compilation of years' worth of evaluations and assessments, it would likewise require a substantial "degree of time, effort and expense" for anyone to reproduce the information, which again, favors a finding that the information is not readily ascertainable. *See Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 918 (Ind. 1993).

Further, because PBLLC's analytics and evaluations include professional opinions on a wide variety of attributes, including a player's potential contribution to the Pacers, by definition the information cannot be easily replicated or ascertained. *See PrimeCare Home Health,* 824 N.E.2d at 381. As the complex analytics and professional opinions are housed in customized databases that are unique to the Pacers, the Subpoena clearly seeks proprietary information that is not "generally known" or "readily ascertainable" to any other NBA team or the public. Thus, this information is entitled to protection as a trade secret. *See* I.C. 24-2-3-2.

PBLLC also undertakes tremendous efforts at maintaining the secrecy and private nature of its player evaluations and assessments, thus satisfying the fourth factor of the trade secret analysis – it is the subject of reasonable efforts to maintain its secrecy. For one, access to the player evaluation and data analytics databases, where all the proprietary information is maintained, is limited to only those PBLLC employees with a need to know the information for the performance of their job duties. Ex. B at ¶ 8. Further, even within those specific roles, PBLLC provides different levels of access to certain employees. *Id*. Applicable employees are provided limited authorization to access only information that is essential to their job function. *Id*. For instance, access to an entire player's file is limited to only upper management in the Basketball Operations division with decision-making authority. *Id*. Indeed, even each professional scout has limited access and is unable to review a player's entire file unless granted special access on an as-needed basis. *Id*. at ¶ 7 and 8. Perhaps most importantly, PBLLC's player assessments and evaluations are **never** shared outside of the organization. *Id*. at ¶ 7. Further, PBLLC uses industry best practices from an information technology perspective to protect all of its data and proprietary information.

All of PBLLC's professional scouts and basketball personnel (e.g., coaches, General Manager, President of Basketball Operations, etc.) with access to the proprietary player assessments and evaluations are also subject to non-disclosure and confidentiality agreements, which limits their ability to discuss information outside of the organization during and after employment with PBLLC. Ex. B at ¶ 7. All employees with access to the proprietary player assessments and evaluations that leave PBLLC lose access to such information immediately upon resignation or termination. *Id*. at ¶ 9. Moreover, even when an employee provides notice of termination or that he/she is interviewing for a job with another NBA team, his/her access to the proprietary player assessments and evaluations is either terminated immediately or limited. *Id*.

Alternatively, if PBLLC's proprietary information does not constitute "trade secrets," it undoubtedly qualifies as "confidential commercial information," which is entitled to protection under Rule 45 as well. *See* FRCP 45(d)(3)(B)(i). Confidential commercial information "is more than just routine business data; instead, it is important proprietary information that provides…a financial or competitive advantage when it is kept secret." *United Prop. & Cas. Ins. v. Couture*, No. 2:19-CV-01856-DCN, 2020 WL 2319086, at *7 (D.S.C. May 11, 2020) (internal citations omitted). In one jurisdiction, a court has defined "confidential commercial information" as information that would cause substantial economic harm to the competitive position of the party if disclosed. *Cobb v. Ramey Motors, Inc.*, No. CIV.A. 1:07-00280, 2014 WL 7159235 at *4 (S.D.W. Va. Dec. 15, 2014).

As discussed above, the player evaluations and assessments are proprietary in nature as PBLLC relies on this information to make strategic and economic decisions to be competitive in the NBA. The economic advantage in maintaining the confidential commercial information is also evident as a practical matter as the Pacers have been to the NBA playoffs nine (9) times since 2010. Disclosing the player evaluations would cause irreparable harm to the Pacers' competitive position as other NBA teams would know PBLLC's internal decision-making process when scouting prospective players. *See* Ex. B at ¶ 11. With that knowledge, other teams could adopt similar approaches as PBLLC, resulting in the Pacers losing their competitive advantage in the NBA. *Id.* The disclosure of how PBLLC evaluates players could also be detrimental to its relationship with the players, including Bowen Jr., which could impact contract negotiations. *Id.* at ¶ 12. Put simply, because the player evaluations and assessments disclose how PBLLC forms a competitive team, the disclosure of that confidential information would essentially be giving other interested parties, including competitors of the Pacers, the Pacers' "playbook." For comparison,

the reason the New England Patriots were punished by the NFL for recording opponents' practices was because of the competitive advantage they received: they were able to see their competitors' playbook. When a team knows the play their competitor is going to call, they can proactively prepare for it, rather than react to it. The same concern applies here – if teams understand the criteria that PBLLC utilizes to create a playoff-caliber team, they can adopt the same strategies and use that information against the Pacers.

### c.   The Subpoena Causes Undue Hardship on PBLLC

The Federal Rules of Civil Procedure permit a court to allow production of documents instead of quashing or modifying a subpoena if the requesting party shows a substantial need for the material that cannot otherwise be met without *undue hardship*. FRCP 45(d)(3)(c) (emphasis added). The goal of preventing undue hardship is intended to be a protection to nonparties, and by using the word "nonparty," it is intended to be a reminder of the limitations on third-party discovery. *Century Sur. Co. v. Master Design Drywall, Inc.*, No. 09CV0280 LAB (AJB), 2010 WL 2231890, at *1 (S.D. Cal. June 2, 2010) (internal citations omitted). The limits of discovery provided in Rule 26 are applicable to non-party discovery. *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016) (internal citations omitted). Thus, when a party seeks information that "can be obtained from some other source that is more convenient, less burdensome, or less expensive…" then the court must limit discovery. *Donald v. Outlaw*, No. 2:17-CV-32-TLS-JPK, 2020 WL 2899689, at *7 (N.D. Ind. June 2, 2020). Courts also consider non-party status to litigation in determining the undue burden. *In re Motion to Quash Subpoena*, No. 120MC00002JPHTAB, 2020 WL 833445, at *2 (S.D. Ind. Feb. 20, 2020) (internal citations omitted).

Specific requests of the Subpoena pose an obvious undue burden on PBLLC, and Adidas cannot show otherwise. PBLLC is a non-party with no involvement or interest in the Litigation. Request No. 6 asks for "documents concerning interest by other NBA teams in signing Bowen Jr. to a player contract." Ex. A. First, PBLLC cannot speak to the interest of *other* NBA teams, as that "interest" is confidential information to those NBA teams which PBLLC is not privy to. Second, this request would be better directed at other NBA teams who would be in possession of such documents. Since Adidas could easily obtain some of the information sought in the Subpoena – specifically, Request No. 6 – from another source, and doing so would be more cost effective, the court must quash the Subpoena with respect to Request No. 6. *See Donald*, No. 2:17-CV-32-TLS-JPK, 2020 WL 2899689, at *7.

### d. The Confidentiality Order and Any Protective Order Would Be Insufficient

A protective order will not protect PBLLC from economic harm. Under Rule 45, in addition to quashing or modifying a subpoena, the court may enter a protective order to protect the privacy of the nonparty. In cases involving trade secrets, federal courts apply a three-part balancing test to determine whether the information can be protected from discovery. *See Bridgestone Americas Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 193 (Ind. 2007). *See also Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525 (D.Del.2002). The party opposing discovery must first show that the information sought is a trade secret or confidential commercial information, and that disclosing such information would be harmful. *Id.*; *See also* FRCP 26(c)(7). The burden then shifts to the party seeking discovery to show that the information sought is relevant and necessary. *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525 (D.Del.2002). Then, if both parties satisfy their burdens, "the court must weigh the potential harm

of disclosure against the need for the information in reaching a decision." *Id.* (citing *In re Remington Arms Co., Inc.*,952 F.2d 1029 (8th Cir.1991).

As discussed above, most of the information sought in the Subpoena clearly qualifies as trade secrets under Indiana law, or at the very least, confidential commercial information. Moreover, disclosing the information would certainly be harmful to PBLLC as discussed herein. In addition, disclosure to Adidas could be detrimental because it has interests adverse to PBLLC. Adidas is a sports apparel and shoe brand company that enters into endorsement and sponsorship deals with players. Indeed, as reported in Adidas' 2019 Annual Report, part of its brand strategy is partnering with high profile individuals, which includes professional basketball players.[7] Some players earn just as much, if not more, in endorsement deals than they do from their NBA contracts.[8] Because Adidas' interests are aligned with the players, rather than the NBA teams, procuring information on how PBLLC values and evaluates players could be provided to players and used against PBLLC in contract negotiations. For example, a player that learns PBLLC rates certain skillsets as top tier could demand new contract terms if that player meets that top tier criteria, which could be detrimental economically for PBLLC. Further, if a player learns that they are ranked higher in certain categories than other players, it is feasible that they would demand to be paid just as much, if not more, than players with similar rankings. Likewise, relationships could sour if players discover how PBLLC initially evaluated a player's skills, which could impact the player's performance and desire to be on the team. The information could also be provided to each respective players' agents as well, which could be used as bargaining chips with PBLLC or other

---

[7] *See* "2019 Annual Report," adidas, pg. 56. *Available at* https://report.adidasggroup.com/2019/en/servicepages/downloads/files/adidas_annual_report_2019.pdf.

[8] Kurt Badenhausen, "The NBA's Highest-Paid Players 2019-20: LeBron James Scores Record $92 Million," FORBES (Oct. 23, 2019).

NBA teams. The foregoing examples are just a few of the many negative impacts on PBLLC if this proprietary information is disclosed, especially as a nonparty to the Litigation.

To clarify, PBLLC is not alleging that Adidas or its counsel would deliberately disclose PBLLC's proprietary information in violation of a protective order. Rather, once the information is disclosed, PBLLC is at risk of "inevitable disclosure." In *PepsiCo, Inc. v. Redmond*, the 7th Circuit recognized the inevitable disclosure doctrine, albeit in a different context, noting that individuals may not be able to compartmentalize information they learn that is subject to confidentiality. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995). As the phrase goes, you cannot "un-ring a bell." The same applies here – once Adidas understands how PBLLC evaluates players, it will inevitably become known to Adidas how PBLLC's basketball operations and scouting and analytics professionals operate internally to construct a winning NBA team. Even if Adidas does not ultimately use the requested information in the Litigation, the fact remains that they will **know** the internal decision-making process of PBLLC. Adidas will be given direct access to how an NBA team values and evaluates players. That disclosure could cause immeasurable economic harm to PBLLC. Further, although the Subpoena requests information as it pertains to Bowen Jr., only, by disclosing PBLLC's internal rankings of his skillsets, Adidas will inevitably discover PBLLC's evaluation methods of other players' skillsets as well.

In the event the court finds that Adidas can show that the information requested is relevant and necessary, the court must weigh the harm of disclosure against the need of the information, which clearly favors PBLLC for all of the reasons set forth herein. *See In re Remington Arms Co., Inc.*, 952 F.2d 1029 (8th Cir.1991).

Although a Confidentiality Order has already been entered in the Litigation, it is insufficient for the reasons discussed herein. Like a protective order, the Confidentiality Order

cannot protect PBLLC from inevitable disclosure. The value of PBLLC's proprietary information is founded upon its secrecy and, once it is disclosed, its value is severely diminished.

## VI.    Conclusion

The Subpoena, in part, must be quashed by this court. Adidas is not only requesting Bowen Jr.'s medical information, it is requesting highly guarded proprietary information that PBLLC has invested substantial resources into gathering, evaluating, and protecting. The Federal Rules of Civil Procedure require the court to quash subpoenas when they seek privileged or protected information, such as the medical information and the player contract sought in the Subpoena. Courts may also quash or modify subpoenas that seek confidential commercial information or trade secrets. The information requested in the Subpoena is without a doubt entitled to protection as it seeks trade secrets. The court must also consider the undue burden of the Subpoena, specifically as it seeks information that is better suited to be requested from another source, and seeks information that is in the plaintiff's possession (e.g. Bowen Jr.'s player contract). Finally, a protective order will not avoid the irreparable economic harm that PBLLC would face if it is compelled to disclose the requested information. As a result, the Subpoena must be quashed, with the exception of Request No. 7.

**WHEREFORE**, PBLLC respectfully moves this Court for an Order Quashing the Subpoena, in part, served by Adidas, and requests all other relief just and proper in the premises.

Respectfully submitted,

/s/ Stacy Walton Long
Stacy Walton Long, Attorney No. 25149-49
KRIEG DEVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
Phone: (317) 238-6356
FAX: (317) 636-1507
Email: slong@kdlegal.com

Attorney for Pacers Basketball, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Matthew T. Richardson, Esq.                    Lucy Dinkins
mrichardson@wyche.com                          ldinkins@wyche.com

I further certify that a copy of the foregoing has been served upon the following counsel of record by depositing a copy of the same in the United States mail, first class postage prepaid this 19th day of January, 2021:

Matthew T. Richardson, Esq.
Wyche, P.A.
807 Gervais St., Suite 301
Columbia, SC 29201

Lucy Dinkins
Wyche, P.A.
807 Gervais St., Suite 301
Columbia, SC 29201

/s/ Stacy Walton Long
Stacy Walton Long

KD_13056851.10.doc