UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PACERS BASKETBALL, LLC, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 1:21-mc-00004-TWP-MJD |
| ) | |
| ADIDAS AMERICA, INC., ) | |
| ) | |
| Respondent. ) | |

**ORDER ON MOTION TO QUASH**

This matter is before the Court on Petitioner's Motion to Quash Subpoena to Produce Documents [Dkt. 1]. The motion relates to a subpoena that was issued to Petitioner Pacers Basketball, LLC, ("the Pacers") by Respondent Adidas America, Inc., ("Adidas") in the course of discovery in a case pending in the District of South Carolina. *Brian Bowen II vs. Adidas America, Inc., et al.*, 3:18-3118-JFA (D.S.C.) (hereinafter referred to as "the *Bowen* case"). The Court, having considered the parties' briefs, and having reviewed each of the documents at issue *in camera*, rules as follows.

**I.  Background**

Brian Bowen's NCAA basketball career at the University of Louisville ("U of L") ended before it began when, early in Bowen's freshman year on campus, his father was accused of accepting a $100,000 bribe to steer him to attend U of L. As alleged in the *Bowen* case, the bribe was revealed in September 2017, when three criminal complaints were unsealed in the Southern District of New York, charging two Adidas executives, four NCAA Division I men's basketball coaches, and others with various charges relating to alleged bribery of college basketball coaches

by Adidas executives and improper payments to the families of basketball players so that the players would elect to play at colleges that were affiliated with Adidas.

In the *Bowen* case, Bowen alleges that the bribery scheme engaged in by Adidas and the other Defendants in that case caused him to lose his eligibility to play Division I basketball at U of L and any other NCAA member institution, which in turn caused him to lose "the ability to develop basketball skills at the highest level of amateur competition as a Division I athlete" and "the opportunity to enter the NBA draft as a first or second round draft pick after only one or two years of experience playing Division I basketball." [Dkt. 8-1 at 101.]

Instead of playing in the NCAA, Bowen played professional basketball in the National Basketball League in Australia for the Sydney Kings. Bowen was not selected in the 2019 NBA draft, but for both the 2019-2020 and 2020-2021 seasons he signed a "two-way" contract with the Indiana Pacers and its development team, the Fort Wayne Mad Ants.

## II. The Subpoena

As part of its discovery efforts in the *Bowen* case, Adidas served a subpoena on the Pacers. The subpoena sought eleven categories of documents; the following remain at issue:

- All documents created prior to July 1, 2019, concerning Bowen Jr.'s prospects as a professional basketball player, including but not limited to any written evaluations or assessments, whether formal or informal, of(a) Bowen Jr.'s basketball skills, abilities, deficiencies, performance, or development potential; (b) the impact, if any, of Bowen Jr.'s lack of experience playing college basketball; and/or (c) the impact, if any, of Bowen Jr.'s experience playing professional basketball for the Sydney Kings.

- All documents created on or after August 24, 2020, concerning Bowen Jr.'s prospects as a professional basketball player, including but not limited to any written evaluations or assessments, whether formal or informal, of(a) Bowen Jr.'s basketball skills, abilities, deficiencies, performance, or development potential; (b) the impact, if any, of Bowen Jr.'s lack of experience playing college basketball; and/or (c) the impact, if any, of

2

> Bowen Jr.'s experience playing professional basketball for the Sydney Kings.
>
> - All documents relating to Bowen Jr.'s potential selection in the 2018 or 2019 NBA draft.
>
> - All documents concerning the Pacers' decision to sign Bowen Jr. to a player contract and/or the negotiations between the Pacers and Bowen Jr., or any Representative of Bowen Jr., relating to his contract.
>
> - All documents concerning interest by other NBA teams in signing Bowen Jr. to a player contract.
>
> - Any document created on or after August 24, 2020, reflecting a desire to retain Bowen Jr. as a member of the Indiana Pacers or Fort Wayne Mad Ants.
>
> - All documents concerning the Pacers' decision to extend, or not extend, a Qualifying Offer (as defined in the NBA/NBPA Collective Bargaining Agreement) to Bowen Jr., or to enter into any other contract with Bowen Jr., for the 2020-2021 NBA season.
>
> - Documents sufficient to show the Pacers' assessment of the National Basketball League ("NBL"), including its views on the viability of playing basketball in the NBL as a path to the NBA.

[Dkt. 1-1.] The Pacers have provided the responsive documents—89 in total—to the Court for *in camera* review.

### III.  Applicable Standard

The Pacers move to quash Adidas's subpoena pursuant to Federal Rule of Civil Procedure 45(d)(3)(A)(iv), which requires the Court to modify or quash a subpoena that subjects the subpoenaed party to "undue burden," as well as Federal Rule of Civil Procedure 45(d)(3)(B)(i), which provides that a court may quash or modify a subpoena "if it requires . . . disclosing a trade secret or other confidential research, development, or commercial information." In determining whether to quash a subpoena seeking discovery from a non-party, the Court must first start with

3

Federal Rule of Civil Procedure 26(b)(1), which defines the proper scope of discovery as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Because the definition of relevance in the discovery context is very broad, "[r]elevance is not, on its own, a high bar." *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019). However, Rule 26 also requires that discovery be "proportional to the needs of the case." The Fourth Circuit recently examined this requirement as it relates to Rule 45 subpoenas for documents.

> When discovery is sought from nonparties, however, its scope must be limited even more. Nonparties are "strangers" to the litigation, and since they have "no dog in [the] fight," they have "a different set of expectations" from the parties themselves. *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). Bystanders should not be drawn into the parties' dispute without some good reason, even if they have information that falls within the scope of party discovery. . . .
>
> A more demanding variant of the proportionality analysis therefore applies when determining whether, under Rule 45, a subpoena issued against a nonparty "subjects a person to undue burden" and must be quashed or modified. Fed. R. Civ. P. 45(d)(3)(A)(iv). As under Rule 26, the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient. *In re Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018); *Citizens Union of N.Y.C. v. Att'y Gen. of N.Y.*, 269 F.Supp.3d 124, 138 (S.D.N.Y. 2017). But courts must give the recipient's nonparty status "special weight," leading to an even more "demanding and sensitive" inquiry than the one governing discovery generally. *In re Public Offering PLE Antitrust Litig.*, 427 F.3d 49, 53 (1st Cir. 2005).

*Id.* The Fourth Circuit noted that

> [o]n the benefit side of the ledger, courts should consider not just the relevance of information sought, but the requesting party's need for it. *See Wiwa v. Royal Dutch Petrol. Co.*, 392 F.3d 812, 818 (5th Cir. 2004). The information sought must likely (not just theoretically) have marginal benefit in litigating important issues. (We mean "marginal" in the economic sense that the information must offer some value over and above what the requesting party already has, not in the sense that a mere *de minimis* benefit will suffice.)

*Id.* at 189. The court further noted that, in addition to the "dollars-and-cents costs," a court should consider "other cognizable burdens as well," such as the fact that "a subpoena may impose a burden by invading privacy or confidentiality interests." *Id.* at 189-90 (citing *Modern Plastics*, 890 F.3d at 251-52; *In re Missouri Dep't of Corr.*, 839 F.3d 732, 736-37 (8th Cir. 2016); *Fappiano v. City of New York*, 640 F. App'x 115, 121 (2d Cir. 2016)). Finally, the court noted:

> Courts may consider the interests of the recipient of the subpoena, as well as others who might be affected. The text of Rule 45 makes that clear, encompassing burdens on any "person," not just the recipient of the subpoena. Fed. R. Civ. P. 45(d)(3)(A)(iv). For example, if a subpoena seeks information from a business about its customers, it may implicate the business's interest in protecting competitively sensitive information, as well as the customers' interest in protecting their privacy, *see Modern Plastics*, 890 F.3d at 251-52.

*Id.* The Court has applied these principles in considering the instant motion.

## IV. Discussion

The Pacers argue that they should not be required to produce the documents responsive to Adidas's subpoena because those documents contain "highly guarded confidential and proprietary information." [Dkt. 1 at 1.] To support its argument, the Pacers submitted the affidavit of its General Manager, Chad Buchanan, who avers the following:

> [The Pacers organization] utilizes comprehensive processes and algorithms as part of its evaluation, scouting, and recruiting of players at the national and international level. In addition to investing a substantial amount of time and energy to develop our own processes and methods for scouting, recruiting, player evaluations, and data analytics that are unique to the Pacers' needs, [the Pacers

5

> organization] spends several million dollars, annually, on these elements, which includes the costs of using third-party vendors, in order for the Pacers to be a competitive team in the NBA. The success of these processes and methods are directly correlated to [the Pacers organization's] economic success, such as overall revenue, including ticket revenues, sponsorship revenues, broadcasting revenues, and merchandise sales.
>
> As part of its scouting, player evaluations, and data analytics process, confidential data and information is gathered, created and maintained internally and with various third-party vendors, such as RealGM and Synergy. [The Pacers organization] works with these vendors to customize software solutions that address [the Pacers organization's] unique strategic needs, such as fine-tuning the professional opinions, categories, attributes, skillsets, types of rankings, and overall layout of its player evaluations and assessments. Thus, the data held, generated, and maintained internally and by third-party vendors is not publicly available information, as it is specific datasets that [the Pacers organization] elects to track and create based on its competitive objectives. Additionally, the customized services and the deliverables [the Pacers organization] requests are protected by confidentiality obligations in its vendor agreements.
>
> ***
>
> Disclosing [the Pacers organization's] player evaluations and assessments would cause irreversible harm to [the Pacers organization] because other NBA teams would learn how [the Pacers organization] creates and maintains a competitive NBA team, and [the Pacers organization] would lose its competitive advantage if those methods were adopted by other NBA teams.
>
> Further, [the Pacers organization] cannot disclose player evaluations and assessments specific to Bowen Jr., as it will inevitably disclose [the Pacers organization's] methods for evaluating players that are based on its unique roster needs, financial constraints, and short and long term goals. Disclosure of this information would not only harm [the Pacers organization's] relationship with Bowen Jr., the disclosure of how [the Pacers organization] values and evaluates players could also be used against [the Pacers organization] in contract negotiations with other players and agents.

[Dkt. 1-2.] The affidavit also makes it clear that the Pacers have strict policies and non-disclosure agreements designed to protect the confidentiality of their player assessment information. *Id.* In addition, the Court's *in camera* review of the documents has revealed that they contain information obtained from other third parties as well—third parties who had

undoubtedly spoken candidly because they had an expectation that the confidentiality of their opinions and observations would be maintained. Thus, the Pacers have demonstrated that complying with the subpoena would impose a burden on them by requiring them to produce confidential, proprietary information.

While Adidas correctly notes that a protective order—either the one already in place or one with even greater restrictions—would provide some protection for the Pacers' information, the fact remains that if Adidas decides to use the information in its defense of the *Bowen* case, there is no guarantee that it will remain out of the public record, given the presumption that court proceedings are open to the public. *See, e.g.*, *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy."). Further, as a non-party, the Pacers' ability to monitor the use of their confidential information at trial or otherwise and advocate for its sealing would be hindered.

The burden of production on the Pacers does not necessarily require quashing the subpoena, however. Rather, the Court must weigh that burden against Adidas's need for the information in order to determine whether the discovery sought by Adidas passes Rule 26's proportionality test. Having reviewed the documents, the Court easily concludes that it does not. Adidas argue that it needs the information it seeks from the Pacers to "defend itself against Mr. Bowen's fanciful claim that he failed to secure a multi-million dollar NBA rookie contract solely because he did not play Division I college basketball, and not because of any of his actual or perceived shortcomings as a player." [Dkt. 8 at 2.] Specifically, Adidas argues that it needs information about "the Pacers' decisions each season to hire Mr. Bowen as a player and the effect, if any, his lack of experience playing college basketball and his experience prior to

7

joining the Pacers actually had on the Pacers' decision to hire him" and that "[i]nformation regarding the Pacers' decisions to sign Mr. Bowen, and how and to what extent his experiences prior to and since joining the team have impacted the team's decisionmaking, is highly probative on the issue of whether Mr. Bowen's failure to play in the NCAA had the effect on his career that he claims." *Id.* at 2-3.  Having reviewed the responsive documents *in camera*, the Court finds that, while they may be relevant to the *Bowen* case, because Bowen's skills as a basketball player are relevant, Adidas has ample information available to it regarding Bowen's skills as a basketball player from other sources.  The Pacers do not have access to a parallel universe in which Bowen played in the NCAA for a season or two and then entered the NBA draft any more than the parties to the *Bowen* case do.  Rather, the Pacers have information about how well Bowen has actually played at each stage of his basketball career.  So does Adidas.  The particular information and observations collected by the Pacers will not add enough to the information Adidas otherwise has to justify the burden on the Pacers identified above.  In other words, Adidas's ability to defend in the *Bowen* case simply would not be aided in any appreciable way by the Pacers' documents.  Accordingly, the discovery sought by Adidas does not satisfy the proportionality requirement of Rule 26 and being required to produce the documents would impose an undue burden on the Pacers.  The motion to quash is therefore **GRANTED**.

    SO ORDERED.

Dated:  20 APR 2021

    Mark J. Dinsmore
    United States Magistrate Judge
    Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.